UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| DAVID FEINWACHS, | Civil No. 11-8 (JRT/SER) |
| Plaintiff, | |
| v. | **SEALED MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| MINNESOTA HOSPITAL ASSOCIATION, and MCCA | |
| Defendants. | |

Brian E. Wojtalewicz, **WOJTALEWICZ LAW FIRM, LTD**, P.O. Box 123, Appleton, MN 56208, for plaintiff.

Lee A. Lastovich and Elizabeth S. Gerling, **JACKSON LEWIS P.C.**, 150 South Fifth Street, Suite 3500, Minneapolis, MN 55402, for defendants.

Plaintiff David Feinwachs brought this action against the Minnesota Hospital Association and its subsidiary the MCCA (referred to collectively as "MHA"), alleging that MHA violated anti-retaliation provisions in the federal False Claims Act ("FCA"), the Minnesota False Claims Act ("MFCA"), and the Minnesota Whistleblower Act ("MWA") by firing him because of his efforts to expose unlawful conduct by various health maintenance organizations ("HMOs"). MHA now moves for summary judgment on all remaining claims. Because genuine disputes of fact remain regarding all the elements of Feinwachs' FCA and MFCA claims, the Court will deny MHA's motion to dismiss those claims. But because the Court will find that Feinwachs has failed to

present evidence that he exposed what MHA already knew, the Court will grant MHA's motion to dismiss Feinwachs' MWA claim.

## BACKGROUND

### I.   FACTUAL BACKGROUND

#### A.   The Parties

Defendant MHA is a trade association comprised of Minnesota hospitals and hospital systems. (Decl. of Elizabeth Gerling ("Gerling Decl.") ¶ 4, Ex. 15 at 2-3, May 1, 2017, Docket No. 117.) MHA performs a variety of services, including advocacy for public policies aligned with members' interests, educational programs, general legal counsel, public-relations assistance, and expertise in operational and governance issues. (*Id.*; Sealed Ex. 4 ("*Feinwachs I* Massa Dep.") vol. 1 at 16:5-17:22, May 1, 2017, Docket No. 120.)[1] Defendant MCCA is a subsidiary of MHA. (Sealed Ex. 1 ("Feinwachs Dep.") at 59:17-62:9, May 1, 2017, Docket No. 118.) MCCA is the organization that employs the people who do the work of MHA. (Gerling Decl. ¶ 4, Ex. 15 at 2-3.)

Plaintiff David Feinwachs was a 30-year employee for MHA, working as General Counsel and directing legislative advocacy. (Third Am. Compl. ¶ 9, July 9, 2014, Docket No. 43.) He provided legal advice to MHA's members and counseled MHA on internal legal matters. (Gerling Decl. ¶ 4, Ex. 16 at 1; Sealed Ex. 4 ("*Feinwachs I* Massa Dep.")

---

[1] "*Feinwachs I* __ Dep." refers to depositions taken during the state-court litigation of *Feinwachs v. Minn. Council of Health Plans* ("*Feinwachs I*"), 62-CV-11-910, 2011 WL 7768116 (Minn. Dist. Ct. Dec. 30, 2011), in which Feinwachs alleged that the Plans tortiously interfered with his employment relationship with MHA.

vol. 1 at 17:2-20:13, May 1, 2017, Docket No. 120.) He also led MHA's lobbying efforts and became known as MHA's chief lobbyist at the legislature. (Gerling Decl. ¶ 4, Ex. 16 at 1; Sealed Ex. 2 ("*Feinwachs I* Feinwachs Dep.") vol. 1 at 122:13-124:12, May 1, 2017, Docket No. 119.)

### B. The MCHP (the "Plans")

The Minnesota Council of Health Plans (MCHP) (collectively, the "Plans") is an association of licensed nonprofit health-care organizations that provide health insurance. (Gerling Decl., Ex. 10 ("*Feinwachs I* Brunner Dep.") at 17:19-20:1.) Many MHA members and leaders themselves were associated with health systems and Plans. (Gerling Decl., Ex. 3 ("Massa Dep.") at 23:2-26:10.)

Some Plans manage certain Minnesota public-health programs involving Medical Assistance ("Medicaid"). (Third Am. Compl. ¶¶ 18-21.) The Minnesota Department of Human Services ("DHS") delegates the administration of specific Medicaid programs to these Plans. (*Id.*) Under a prepaid contract, DHS pays Plans based on individual Medicaid recipients enrolled with a particular Plan, and the Plans then pay the actual providers of medical care. (*Id.* ¶ 22.) This arrangement is known as the Pre-Paid Medical Assistance Program ("PMAP"). (*Id.*) MHA's leaders and the Plans purportedly shared several common interests and sought to work collaboratively on many advocacy efforts. (Gerling Decl. ¶ 4, Ex. 18; *Feinwachs I* Massa Dep. vol. 1 at 54:10-55:24, 203:22-205:21; *Feinwachs I* Feinwachs Dep. vol. 1 at 156:9-157:24.)

### C. The MPC

The Minnesota Provider Coalition ("MPC") is an association representing physicians, chiropractors, dentists, podiatrists, and other medical-provider groups. (*Feinwachs I* Feinwachs Dep. vol. 1 at 158:16-159:18.) Feinwachs, on behalf of MHA, started working with the MPC in late 2009. (*Id.* at 160:12-14; Massa Dep. at 62:22-64:21.) According to MHA, MPC participants met as representatives of their client organizations, not as individuals on their own time. (Gerling Decl., Ex. 5 ("Kunz Dep.") at 114:4-115:13.)

### D. MHA's Transparency Goals

MHA set a goal in 2010 to "[a]dvocate for greater transparency of state public health program data," including PMAP. (Gerling Decl. ¶ 4, Exs. 24-25; Feinwachs Dep. at 136:8-137:18.) "Advocating for greater transparency" remained a goal for MHA throughout 2010, and MHA continued to pursue that objective after Feinwachs' termination. (Gerling Decl. ¶ 4, Ex. 26.)

MHA asked Feinwachs as its lobbyist and General Counsel to pursue its transparency objective. (Feinwachs Dep. at 136:8-137:18, 156:5-157:3.) Feinwachs does not dispute MHA's goal of greater transparency, and he admits that the scope of his duties for MHA included investigative efforts, including obtaining data, reviewing documents, and researching transparency. (*Id.* at 130:24-131:19, 174:5-176:14.)

E. **Feinwachs' Conduct Leading Up to Termination**

In 2010, Feinwachs started participating in what he calls "an intensive lobbying and political campaign" aimed at "warn[ing] Minnesota legislators and healthcare professionals about the apparent impropriety of PMAP contractors receiving millions in excessive reserves from [Medicaid] without any true audits and inadequate accountability." (Third Am. Compl. ¶ 95.)  Much if not all of the informational basis for Feinwachs' PMAP-related statements and actions came from pre-2010 public sources. (*Id.* ¶¶ 23, 28, 30-31, 33-36, 79, 82, 86, 102; Feinwachs Dep. at 154:2-156:1.)

In February 2010, Feinwachs testified before the Minnesota legislature in support of the "Abeler Amendment," which proposed modifying PMAP administration. (*Feinwachs I* Feinwachs Dep. at 176:1-178:1.)  During his legislative testimony, Feinwachs described Minnesota's approach to PMAP as "basically busting off a giant hunk of the state budget, giving it to every vendor who steps up to the counter, and say, go in peace; hope it works out." (Gerling Decl. ¶ 4, Ex. 28 at 7.)  Representative Abeler immediately tried to withdraw the Amendment after Feinwachs' "provocative" testimony. (*Id.*)

In May, Feinwachs hired an attorney, Brian Wojtalewicz (his counsel of record in this action), to "investigate fraud involving . . . the government and the health plans." (Feinwachs Dep. at 91:10-92:13.)  Feinwachs claims that his purpose in hiring Wojtalewicz was "to pursue a [qui tam] claim under the [FCA]" and that Wojtalewicz's hiring "overlapped" with the work that Feinwachs was performing for MHA on the transparency issue.  (*Id.* at 178:18-179:9.)  Among other things, Wojtalewicz interviewed

- 5 -

a former DHS employee about potential improprieties with the Plans and Medicaid.  (*Id.* at 91:10-92:13.)  Feinwachs did not tell anyone at MHA that he had hired Wojtalewicz nor did he seek permission from his boss, Lawrence Massa (the President and CEO of MHA) or anyone else at MHA to hire Wojtalewicz.  (*Id.* at 91:10-92:13, 178:4-17.)  Feinwachs did not pay Wojtalewicz with MHA money – he hired Wojtalewicz on a contingent-fee basis.  (*Feinwachs I* Feinwachs Dep. vol. 3 at 18:9-21.)  Massa would not learn that Feinwachs had hired Wojtalewicz until late July.  (*Id.* vol. 3 at 17:11-18:2)

In June, Massa told Feinwachs that MHA would not be pursuing the transparency issue via legislation.  Massa instructed Feinwachs that he was not to testify before the legislature, but that Feinwachs should continue working on the transparency issue.  (*Id.* vol. 1 at 195:1-196:13; *Feinwachs I* Massa Dep. at 49:19-54:6.)  Massa gave Feinwachs permission to work with MPC on transparency, but Massa told Feinwachs that he needed to "back off in terms of his tactics."  (*Feinwachs I* Massa Dep. vol. 1 at 199:1-203:18.)

Around July 20, after the state legislative session had ended in May, Feinwachs made – but had not yet distributed or published – a video highlighting the issue of PMAP money and the Plans.  (Third Am. Compl. ¶ 102; *Feinwachs I* Feinwachs Dep. vol. 1 280:21-281:12.)  The video was a "year-end legislative summary," portraying that there is not a "clear regulatory mechanism for the operation of the PMAP program by the vendors," that there is "confusion" about "who is in charge of what and where the money goes," and that some of the numbers "don't add up."  (*Feinwachs I* Feinwachs Dep. vol. 1 at 280:2-283:24; *see also* Gerling Decl. ¶ 4, Ex. 31.)

Coincidentally, during the same few days in July, Brian Osberg, the director of the state Medicaid program, learned that Feinwachs had hired Wojtalewicz to interview the former DHS employee. (*Feinwachs I* Massa Dep. vol. 1. at 59:2-60:12.) Osberg called Massa and told Massa about what he had just learned. (*Id.*)

On July 22,[2] Massa met with Feinwachs along with Matt Anderson, a vice president at MHA. Massa asked Feinwachs if he had hired Wojtalewicz to interview the former DHS employee, and Feinwachs responded that he had. (Feinwachs Dep. at 176:15-178:10.) According to Massa, Feinwachs was instructed to "stop the antics," that MHA was "done supporting [MPC]," and that even Feinwachs acting on his own could not "create the kind of separation [between MHA and the MPC] that apparently [Feinwachs] thought it would." (Massa Dep. at 90:7-92:2.) According to Feinwachs, Massa instructed Feinwachs to no longer participate with MPC "in an official capacity." (Feinwachs Dep. at 183:21-184:1, 195:2-12.)

Feinwachs did not explicitly mention the FCA or his plans for a qui tam action during the July 22 meeting. (*Id.* at 179:10-180:10.) But Feinwachs testified that Massa asked him during the July 22 meeting if he had hired Wojtalewicz for "some kind of whistleblower thing," and, if so, who the plaintiffs were. (*Id.* at 139:2-140:8.) Feinwachs testified that he said "yes, that's exactly what it is," and that he and David Kunz, another

---

[2] There is some discrepancy on the exact date of this meeting. It may have occured on July 23. But the sequence of events is undisputed. (Feinwachs Dep. at 177:5-8.)

MPC member, were the plaintiffs. (*Id.*) Massa, however, denies that he asked Feinwachs about any "whistleblower thing." (Massa Dep. at 91:11-20.)

That same day, almost immediately after Feinwachs' meeting with Massa and Anderson, Feinwachs exchanged emails with several MPC members to "plan how and to whom the [video] should be made available." (Feinwachs Dep. at 192:12-194:23.) In the following weeks, Feinwachs sent the video to legislators, lobbyists, and friends. (Gerling Decl. ¶ 4, Ex. 34.)

In September, Feinwachs produced a second video, nearly identical to the first, but with added findings from a later report. (Third Am. Compl. ¶ 106.) At least one MPC member characterized the second video's tone as adversarial. (Gerling Decl. ¶ 4, Ex. 36 at 1.)

On October 14, Massa received an email from an MHA board member expressing concern about Feinwachs' videos. (Gerling Decl. ¶ 4, Ex. 38.) Massa replied to this board member that he had asked Feinwachs "to stop participating in the activities of [MPC]," and that he was "sure that Dave has backed off since I told him to do so and that the videos precede that conversation." (*Id.*) Massa also stated that, while Feinwachs' "approach is unquestionably unconventional," he is "an effective advocate for our members" and is "an asset more often than a liability." (*Id.*)

It was also around October 14 when Massa first watched Feinwachs' videos and discovered that the second one had a date stamp of September – after Massa's July 22 meeting with Feinwachs. (*Feinwachs I* Massa Dep. vol. 1 at 73:12-75:4, 78:17-80:9.) Massa placed Feinwachs on administrative leave on October 20 via a letter in which

Massa stated that he understood that Feinwachs' hiring of Wojtalewicz was to "inquir[e] about potential fraud within [PMAP]." (Gerling Decl. ¶ 4, Ex. 40.) Massa fired Feinwachs on November 10. (Massa Dep. at 160:6-14.) MHA's stated reason for Feinwachs' termination is his insubordination and Massa's loss of trust in him. (*Feinwachs I* Massa Dep. at 93:1-22.)

## II.    PROCEDURAL HISTORY

In January 2011, Feinwachs filed this action – which began as a qui tam action – alleging FCA claims against a number of HMOs. (*See* Compl., Jan. 3, 2011, Docket No. 1; Third Am. Compl.) He also asserts against MHA anti-retaliation claims under the FCA, MFCA, and MWA. (Third Am. Compl. ¶¶ 189-92.)

In February 2011, parallel to Feinwachs' qui tam action, Feinwachs filed a state-court action, alleging that the Plans tortiously interfered with his employment relationship with MHA. *Feinwachs v. Minn. Council of Health Plans* ("*Feinwachs I*"), 62-CV-11-910, 2011 WL 7768116 (Minn. Dist. Ct. Dec. 30, 2011). The state district court granted the Plans' motion to dismiss, and the Court of Appeals affirmed. *Feinwachs v. Minn. Council of Health Plans* ("*Feinwachs II*"), No. A12-0375, 2012 WL 4329115 (Minn. Ct. App. Sept. 24, 2012).

Two and a half years later, in March 2015, the government chose not to intervene in Feinwachs' qui tam action. (Government's Notice of Election to Decline Intervention, Mar. 13, 2015, Docket No. 44.) The Court subsequently granted Feinwachs' motion to dismiss his FCA claims against the HMO defendants. (Order, June 1, 2015, Docket No.

48.)  Thus, the only claims that remain in this action are Feinwachs' anti-retaliation claims against MHA.  (*See* Third Am. Compl. ¶¶ 189-92.)

In August 2015, the Defendants' moved to dismiss these remaining anti-retaliation claims on the basis of collateral estoppel in light of the state-court decisions.  (Mem. in Supp. of Mot. to Dismiss, Aug. 14, 2015, Docket No. 65.)  The Court denied Defendants' motion because the prior state-court action did not involve the same issues as the present action.  *Feinwachs v. Minn. Hosp. Ass'n*, No. 11-8, 2016 WL 424963 (D. Minn. Feb. 3, 2016).

Defendants now move for summary judgment on Feinwachs' anti-retaliation claims.

## DISCUSSION

### I.  STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving

party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009).

## II.   FEINWACHS' FCA ANTI-RETALIATION CLAIM

The FCA prohibits retaliation against an employee "because of lawful acts done by the employee . . . in furtherance of an [FCA] action . . . or other efforts to stop 1 or more [FCA] violations." 31 U.S.C. § 3730(h)(1). "[T]o establish retaliation under the False Claims Act, the plaintiff must prove that

(1) the plaintiff was engaged in conduct protected by the [False Claims Act];

(2) the plaintiff's employer knew that the plaintiff engaged in the protected activity;

(3) the employer retaliated against the plaintiff; and

(4) the retaliation was motivated solely by the plaintiff's protected activity."

*Elkharwily v. Mayo Holding Co.*, 823 F.3d 462, 470 (8th Cir. 2016).

Here, because there remains a genuine dispute of material fact with respect to each of these four elements, the Court will deny MHA's motion to dismiss Feinwachs' FCA anti-retaliation claim.

### A.   Protected Activity

The first element of an FCA anti-retaliation claim is that "the plaintiff was engaged in conduct protected by the [False Claims Act]." *Elkharwily*, 823 F.3d at 470. To constitute protected activity, an employee's conduct must satisfy two conditions: (1) it "must have been in furtherance of an FCA action" and (2) it "must be aimed at matters which are calculated, or reasonably could lead, to a viable FCA action," meaning "the employee in good faith believes, and . . . a reasonable employee in the same or similar circumstances might believe," that the government is being defrauded. *Schell v. Bluebird Media, LLC*, 787 F.3d 1179, 1187 (8th Cir. 2015) (quotation omitted). "The protected activity element of a retaliation claim does not require the plaintiff to have filed an FCA lawsuit or to have developed a winning claim at the time of the alleged retaliation." *Schuhardt v. Wash. Univ.*, 390 F.3d 563, 567 (8th Cir. 2004).

There remains a genuine dispute of material fact as to whether Feinwachs engaged in protected activity. Feinwachs testified that he hired Wojtalewicz for the purpose of pursuing an FCA claim. Wojtalewicz interviewed a former DHS employee about potential improprieties with the Plans and Medicaid. Feinwachs participated in the MPC and associated with its members. A reasonable jury could find that there was an objective basis to believe (at least in 2010) that fraud occurred.[3] And Feinwachs ultimately filed a qui tam action. Viewing these facts in the light most favorable to

---

[3] The Court rejects MHA's argument that there is no objectively reasonable basis to believe that fraud occurred simply because no court or agency has ever found that the Plans engaged in fraud in their administration of PMAP in Minnesota. A court or agency finding of fraud is not the test. Rather, the test is whether there was an objectively reasonable basis to believe in 2010 that fraud had occurred. *Schell*, 787 F.3d at 1187.

Feinwachs, a reasonable jury could find that Feinwachs was engaged in protected activity.[4]

The Court rejects MHA's argument that Feinwachs did not, as a matter of law, engage in protected activity because he was acting within the scope of his job duties. First, is it unclear whether Feinwachs was indeed acting within the scope of his job duties. Feinwachs testified that his efforts to expose Medicaid fraud "overlapped" with his transparency-related job duties. And MHA – at least initially – authorized Feinwachs to work with MPC. Yet MHA maintains that its reason for firing Feinwachs was insubordination because Feinwachs allegedly defied Massa's orders. Second, the cases that MHA cites to support its categorical 'job-duties defense' do not hold that an employee acting within the scope of her job duties cannot, as a matter of law, engage in protected activity. An employee whose duties include reporting illegal behavior is "not automatically precluded from bringing a [qui tam] action," but rather "such persons 'must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations.'" *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 568 (6th Cir. 2012) (quoting

---

[4] That Feinwachs' qui tam claim might have been based on public information – and thus potentially depriving the Court of subject-matter jurisdiction over the qui tam claim pursuant to 31 U.S.C. § 3730(e) – does not prevent the Court from considering Feinwachs' anti-retaliation claim. *United States ex rel. McKenzie v. Bellsouth Telecomms., Inc.*, 123 F.3d 935, 943 (6th Cir. 1997). Moreover, "[a]s long as the relator has 'direct knowledge of the true state of the facts,' she can be an original source even though her 'knowledge of the misrepresentation is not first-hand.'" *United States ex rel. Simpson v. Bayer Healthcare*, __ F.3d __, No. 15-2220, slip op. at 4 (8th Cir. Sept. 8, 2017) (quoting *Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1050 (8th Cir. 2002)).

*United States ex rel. Ramseyer v. Century Health Corp.*, 90 F.3d 1514, 1523 n.7 (10th Cir. 1996)).

### B. MHA's Knowledge

The second element of an FCA anti-retaliation claim is that "the plaintiff's employer knew that the plaintiff engaged in the protected activity." *Elkharwily*, 823 F.3d at 470.

There remains a genuine dispute of material fact as to whether MHA knew that Feinwachs engaged in protected activity. Feinwachs testified that he told Massa that he had hired Wojtalewicz on a contingent-fee basis and that he had not used any MHA funds to pay Wojtalewicz. Feinwachs also testified that he answered affirmatively Massa's question of whether he had hired Wojtalewicz for "some kind of whistleblower thing." And Massa's suspension letter to Feinwachs stated that Massa understood that Feinwachs' hiring of Wojtalewicz was to inquire about potential fraud within PMAP. *See United States ex rel. Scharber v. Golden Gate Nat'l Senior Care LLC*, 135 F. Supp. 3d 944, 969 (D. Minn. 2015). Viewing these facts in the light most favorable to Feinwachs, a reasonable jury could find that MHA knew that Feinwachs engaged in protected activity. *See Ramseyer*, 90 F.3d at 1523 (10th Cir. 1996).

### C. Retaliation

The third element of an FCA anti-retaliation claim is that "the employer retaliated against the plaintiff." *Elkharwily*, 823 F.3d at 470. There can be no retaliation if there is

no "causal connection" between the protected activity and the conduct complained of. *Townsend v. Bayer Corp.*, 774 F.3d 446, 457 (8th Cir. 2014).

There remains a genuine dispute of material fact as to whether MHA retaliated against Feinwachs. Massa told Feinwachs to "stop," that MHA was done supporting MPC, and Massa instructed Feinwachs to no longer participate in the MPC. Although Massa expressed support for Feinwachs before suspending him, Massa's suspension letter to Feinwachs stated that Massa understood that Feinwachs' hiring of Wojtalewicz was to inquire about potential fraud within PMAP. Viewing these facts in the light most favorable to Feinwachs, a reasonable jury could find a causal connection between Feinwachs' protected activity and his firing, and that MHA therefore retaliated against Feinwachs.[5]

### D. MHA's Motivation

The fourth element of an FCA anti-retaliation claim is that "the retaliation was motivated solely by the plaintiff's protected activity." *Elkharwily*, 823 F.3d at 470. "[T]he ultimate issue of causation a plaintiff needs to establish is that the discharge was solely because of protected activity, and a finding of dual motive exonerates the employer." *Norbeck v. Basin Elec. Power Coop.*, 215 F.3d 848, 851 (8th Cir. 2000).

---

[5] MHA argues that *Feinwachs I* already determined that Feinwachs' firing was not pretextual. But *Feinwachs I* held only that Feinwachs' firing was not a pretext for any third-party's influence. As the Court stated in its order denying MHA's motion to dismiss, the state court's holding "does not foreclose the possibility that Massa's decision was based on protected activity, or that 'insubordination' was pretext for an improper motive, such as retaliation." *Feinwachs*, 2016 WL 424963, at *5.

There remains a genuine dispute of material fact as to whether MHA's firing of Feinwachs was motivated solely by Feinwachs' protected activity. MHA insists that its reason for firing Feinwachs was his insubordination. "Of course, employee insubordination is ordinarily a legitimate . . . reason for adverse action." *Kempcke v. Monsanto Co.*, 132 F.3d 442, 446 (8th Cir. 1998). "But when the insubordination consists of refusing to cease what a jury could find to be reasonable . . . protected activity . . . , summary judgment dismissing a retaliation claim is not appropriate." *Id.*

Here, the parties dispute what precisely Feinwachs did that might have been insubordinate. For example, Massa testified that he told Feinwachs to stop associating with MPC. But Feinwachs testified that he was told to disassociate from MPC only "in an official capacity." And Massa's suspension letter to Feinwachs explicitly mentioned Feinwachs' hiring of Wojtalewicz for inquiring about potential fraud. Viewing these facts in the light most favorable to Feinwachs, a reasonable jury could find that MHA's firing of Feinwachs was motivated solely by Feinwachs' protected activity, and that Feinwachs' alleged insubordination consisted of refusing to cease protected activity.

Because there remains a genuine dispute of material fact as to each of the four elements of Feinwachs' FCA anti-retaliation claim, the Court will deny MHA's motion to dismiss Feinwachs' FCA anti-retaliation claim.

### III. FEINWACHS' STATE-LAW CLAIMS

#### A. Feinwachs' MFCA Anti-Retaliation Claim

"The text of the MFCA retaliation provision, Minnesota Statute § 15C.145, is substantially similar to the federal corollary." *Scharber*, 135 F. Supp. 3d at 968-69. "Because the MFCA mirrors the FCA," the Court analyzes both claims "under the FCA." *Olson v. Fairview Health Servs.*, 831 F.3d 1063, 1069 n.6 (8th Cir. 2016). The parties have not provided – nor is the Court aware of – any distinction between the two statutes that would compel a different outcome on Feinwachs' MFCA anti-retaliation claim than on his FCA anti-retaliation claim. The Court will therefore deny MHA's motion to dismiss Feinwachs' MFCA anti-retaliation claim for the same reasons that the Court will deny MHA's motion to dismiss Feinwachs' FCA anti-retaliation claim.

#### B. Feinwachs' MWA Claim

Defendants move to dismiss Feinwachs' MWA claim, arguing that Feinwachs did not "expose" the issue of potential Medicaid fraud by the Plans because he was not the first person to voice any such concerns and that his "exposing" was based on publicly available information.

The MWA prohibits an employer from discharging an employee who "reports a violation or suspected violation of any federal or state law." Minn. Stat. § 181.932

subd. 1 (2010).[6] This Court and Minnesota state courts have "long recognized that 'the mere mention of a suspected violation that the employer already knows about does not constitute a "report" under the [MWA].'" *Pedersen v. Bio-Medical Applications*, 992 F. Supp. 2d 934, 939 (D. Minn. 2014) (quoting *Erickson v. City of Orr*, No. A05-481, 2005 WL 2277395, at *7 (Minn. Ct. App. Sept. 20, 2005)).[7] "'Reporting' what an employer already knows 'exposes' nothing – the employee simply has 'no whistle to blow' in that circumstance." *Id.*

The Minnesota Legislature amended the MWA in 2013. Among other things, the Legislature added a definition of "report." *See* 2013 Minn. Laws ch. 83, § 3. But that amendment does not apply retroactively to Feinwachs. "Although amendments are generally presumed to be prospective in effect, an amendment that merely clarifies the legislature's intent may be applied retroactively." *State v. Lilleskov*, 658 N.W.2d 904, 908 (Minn. Ct. App. 2003). "'Determining whether an amendment constitutes a

---

[6] The parties agree that the version of the MWA effective in 2011 applies to Feinwachs' claim. The allegedly unlawful conduct occurred in 2010, and Feinwachs filed this action in 2011. The Minnesota Supreme Court's recent decision in *Friedlander v. Edwards Lifesciences, LLC*, which counsel identified to the Court at oral argument, concerned the MWA's meaning after the Minnesota Legislature amended the MWA in 2013 – not the meaning of the 2011 version of the MWA. *Friedlander v. Edwards Lifesciences, LLC*, __ N.W.2d __, 2017 WL 3400709, at *4 (Minn. Aug. 9, 2017).

[7] *See also Fjelsta v. Zogg Dermatology, PLC*, 488 F.3d 804, 808-09 (8th Cir. 2007); *Hitchcock v. FedEx Ground Package Sys., Inc.*, 442 F.3d 1104, 1106 (8th Cir. 2006); *Harnan v. Univ. of St. Thomas*, 776 F. Supp. 2d 938, 948 (D. Minn. 2011); *Pelant v. Pinnacle Airlines, Inc.*, No. 05-1173, 2006 WL 2286381, at *6 (D. Minn. Aug. 8, 2006); *Freeman v. Ace Tel. Ass'n*, 404 F. Supp. 2d 1127, 1140 (D. Minn. 2005), *aff'd*, 467 F.3d 695 (8th Cir. 2006); *Kidwell v. Sybaritic, Inc.*, 749 N.W.2d 855, 869 (Minn. Ct. App. 2008); *Cokley v. City of Otsego*, 623 N.W.2d 625, 632 (Minn. Ct. App. 2001); *Rothmeier v. Inv. Advisers, Inc.*, 556 N.W.2d 590, 593 (Minn. Ct. App. 1996).

clarification or modification of preexisting law' is a question of statutory interpretation requiring comparison of 'the pre-amendment and post-amendment versions of a statute.'" *Sledge v. ConAgra Foods, Inc.*, No. 13-2302, 2014 WL 2574749, at *3 (D. Minn. June 9, 2014) (quoting *Braylock v. Jesson*, 819 N.W.2d 585, 588 (Minn. 2012)). Here, the amended statute defines "report" as a "communication . . . **about** an actual, suspected, or planned violation" of law. Minn. Stat. § 181.931 subd. 6 (2014) (emphasis added). By its plain terms, a "report" simply needs to be "about" a violation – it need not "expose" one. Thus, the 2013 amendment to the MWA that defined "report" changed the law, and this amendment therefore does not apply retroactively. And so Feinwachs must ultimately prove that he "exposed" a violation or suspected violation of law, consistent with the version of the MWA applicable in 2011.[8]

Feinwachs does not produce evidence from which a reasonable jury could find that he exposed any conduct that MHA was not already aware of. Indeed, much (if not all) of the information on which Feinwachs based his fraud allegations was publically available at the time. Feinwachs has thus failed to carry his burden at the summary-judgment stage, and the Court will grant MHA's motion to dismiss Feinwachs' MWA claim.

This case will be placed on the Court's next available trial calendar.

---

[8] *Friedlander* further supports the Court's conclusion that the 2013 amendments to the MWA do not apply retroactively. *Friedlander* held that the portion of the 2013 amendments that defined "good faith" in the MWA changed the meaning of that term. 2017 WL 3400709, at *2-4. *Friedlander* comports with the "presumption that the Legislature intends to change the law when it amends a statute." *Id.* at *3.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment [Docket No. 113] is **GRANTED in part** and **DENIED in part** as follows:

    a. Defendants' motion is **DENIED** with respect to Feinwachs' anti-retaliation claim under the FCA.

    b. Defendants' motion is **DENIED** with respect to Feinwachs' anti-retaliation claim under the MFCA.

    c. Defendants' motion is **GRANTED** with respect to Feinwachs' anti-retaliation claim under the MWA.

2. The parties are **ORDERED** to show cause on or before fourteen (14) days from the date of this Order why the Court should not unseal the Order and specify any portion of the Order warranting redaction.

DATED: November 15, 2017           _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                      JOHN R. TUNHEIM
                                                              Chief Judge
                                         United States District Court